Smith, C. J.
At common law, the mode of transferring a freehold estate in lands was for the seller to go with the purchaser on to the lands, and there declare (for in early times writing was very little known), in the presence of the neighboring tenants, the sale; show the boundaries; and deliver possession to the purchaser. This was called a feoffment, and, for ages, was the only mode of passing a fee-simple; and, though it serves equally well to pass other estates of freehold, yet it was held properly to' signify a conveyance in fee. Estates less than freehold were deemed of so little consequence that little solemnity or notoriety was necessary in the transfer of them. Though a writing, a deed, or charter was not essentially necessary, yet in time it became usual. The writing was very brief. The substantial part of the conveyance was not, and could not be, included in it, though usually indorsed upon it; I mean, livery and seisin. Without it, the deed, or any words of conveyance, passed only an estate at will. It is strange that what was once of the essence of the transaction should, in time, come to be considered as a ceremony; for so it is alluded to in our statute of conveyance. When the object of the conveyance was a fee-simple, it may easily be supposed that the persons called to bear witness might easily retain in their memories all that was necessary to be remembered. The witnesses were the neighboring tenants, who held their lands of the same superior. But when the proprietor of lands became desirous of making such a disposition of them as his prudence, justice, the convenience of his family, or caprice, dictated, it is very obvious that written deeds would be indispensably necessary. The conveyance by feoffment is calculated for a well-settled country, where the lands are holden of a superior, where the feudal system prevails, and the tenants are illiterate. It is not adapted to a refined, commercial, and improved state of society. For some time before the reign of Henry VIII., deeds, or charters of feoffment, were in general use; and in these deeds the peculiar purpose and intention of the parties were expressed. Still, they were only used in company with that which in fact passed the land, — livery and seisin.
It is well known that the feudal system imposed many *329 restraints on alienation. It may easily be supposed that men, in early times, must have been desirous of getting rid of these restraints; and the clergy of that day, who had nearly all the learning, were desirous, for the best purposes in the world, of getting into their possession some portion of the land, which was then the only source of wealth in the nation. The statutes;, of mortmain restrained religious houses from purchasing or hold-1' ing lands. About the year 1377, thejr contrived a new method of conveyance, and which was held not to come within the prohibition of the statutes. Lands were granted, not to themselves directly, but to nominal feoffees, to the use of the religious houses; the latter, as entitled to the use, receiving the actual profits, while the seisin of the land, or the legal title, remained in the nominal feoffee. The courts of equity compelled the feoffee to account, to him who had the use, for the rents and profits. In this way, the clergy became, in fact, the owners of the land. The feoffee was, in equity, considered as a naked trustee, and held the legal title for the benefit of another. The barons, who were jealous of the clergy, and dreaded their influence over the common people, procured an act of parliament disabling the clergy from holding lands even in this way. It was soon, however, perceived by the sturdy and illiterate barons themselves, that this mode of conveyance, thus invented and practised by the clergy, suited their views ; for, in effect, it conferred the power of devising, which was not permitted by law. In this way, too, the owner of lands was enabled, in his lifetime, to charge and incumber them, and to make his real estate liable to a multitude of conditions and minute designations [?], for the purpose of raising money without an absolute sale of the land. He could also make provision for the numerous branches of his family ; and, which was, perhaps, of still more consequence, he could secure his ¡ estate from forfeiture for his treasons and other crimes, and : relieve it from the rigor of many feudal burdens. Accordingly, it is said that uses had grown almost universal before the end of the fifteenth century, and the courts of equity had reduced this method of conveyance into a regular system.
It is not to be imagined that this mode of conveyance would *330 be agreeable to the King and the great feudal lords. It was, moreover, attended with many and great inconveniences to all classes of the people, inasmuch as it was secret, and received no countenance from the courts of law. These evils were attempted to be remedied by several statutes, the provisions of which tended to consider him who had the use as the real owner of the estate; and, at length, that idea was carried into complete effect by the statute of 27 Henry VIII., which is usually called the Statute of Uses. If it was intended, by this statute, to destroy uses, as some have supposed, the end was not answered. They abolished the estate of the feoffee by annexing it to the estate of him who had the use. In short, the statute, instead of destroying, legalized this mode of conveyance. I think it must have been foreseen that it would, in practice, entirely supersede the old mode by feoffment. Indeed, while it labored under the disadvantage of having no legal foundation, — depending on the courts of equity entirety for its execution, — we are told that it was in general use in the nation. The sentiments of the nation called for the change.
It was the excellence of this statute that it legalized conveyance by deed without livery of seisin. But it certainty was a very great defect that it made no provision for giving notoriety to the transaction. To prevent, therefore, clandestine conveyances of freehold estates, it was enacted, in the same session of Parliament, that such bargains and sales should not inure to pass a freehold, unless made by indenture and enrolled. It is not easy to perceive why the form of indenture was required, but the reasons for enrolment must strike every mind. If a nation were about to devise a mode of conveyance, and the people were generally able to read and write, that mode would doubtless be a deed which should contain the evidence of the agreement of the parties, the terms and conditions of the sale, a description of the land sold, the estate or interest intended to be passed; which should be solemnly executed, to prevent surprise, fraud, and imposition ; and recorded in some public and convenient place, for the double purpose of preserving the evidence of the sale and of *331 making it manifest to all men. Substantially, the Statute of Uses, with the Statute of Enrolment, extended to all estates as well as those of freehold, answers this description; but the manner in which this conveyance operates is the effect of the peculiar circumstances which gave it birth. It was not an original invention, but an improvement of an invention; the doctrine of uses then in being. Hence it results that a conveyance by deed of bargain and sale can only be made when an use can be raised. If the use is raised by deed, there must be a pecuniary consideration. The deed does not pass the land ; it passes the use, and the statute passes the land to him to whom the deed conveyed the use. The feoffment transferred the actual possession ; the bargain and sale transferred it in law. To constitute a good conveyance by bargain and sale, there must be an use raised ; and, for that purpose, there must be a person seised to the use of some other person ; there must be a cestui que use in esse and an use in esse, in possession, remainder, or reversion. In short, all the learning — ■ subtle, intricate, and nice as it was — respecting uses is necessary to understand the conveyance by bargain and sale, lease and release, and covenant to stand seised to uses.
The first settlement of this country may be taken to be between 1620 and 1630, perhaps the latter. Little, if any, of our legal notions is derived from New Plymouth Colony. There was no general, separate government in New Hampshire before 1679. Before the union with Massachusetts, about 1640, Dover, Portsmouth, and Exeter were separate “combinations.” H. [Hampton?] was always claimed by Massachusetts. It is not known by what law these combinations were governed, or what law they acknowledged. From Massachusetts, then, we are to draw our notions of early law in this State.
At the first settlement of this country, feoffments were little used in England. They had become obsolete even before the Statute of Uses, 1535, a century before this country was settled, (a) Deeds of bargain and sale took their place ; and, *332 if the Statute of Enrolment had been observed, it would have introduced an almost universal register of conveyances of the freehold. A short time before the first settlement of this country, conveyance by lease and release had crept into use ; as this mode did not require enrolment, it soon superseded, in England, the conveyance by bargain and sale ; for there, as well as everywhere else, men have always inclined to secret conveyances. But it does not seem to have found its way into this country. I have had an opportunity, both in this State and in Massachusetts, to examine many ancient conveyances, and have found no trace of it. The conveyances at common law, by lease, lease and release, and release alone, wére in a great measure inapplicable ; there was little, if any, occasion for leases and releases in early times. When English men, or English corporations, had occasion to transfer lands in this country, they generally did it by feoffment with livery, till a statute mode was prescribed here. The deeds of the Council of Plymouth to Bradford of [?] New Plymouth Colony, of the large tract on both sides of K. river; to Capt. John M., of New Hampshireof Masonia in Maine; to Sir Henry Rosewell and others, of Massachusetts ; to Gorges, of a part of Maine ; to Aldsworth and Elbridge, of Pemaquid, — are all deeds of feoffment accompanied with livery and seisin. Several Indian conve3rances, in ver3r early times, were made in the same way. This was a mode of conve3muce more intelligible to the savages than conveyances deriving their operation from the doctrine and statute of uses. But I do not find that the inhabitants of this country, except in a very few instances, ever conveyed by feoffment. Indeed, that mode was singularly ill-adapted to their situation. It could hardly be said that our lands were holden of any superior. The tenure was, indeed, nominally that of free and common socage, but no services, in fact, were due to any superior in respect of lands, aiyr more than in respect of personal property. There was no occasion for any investiture; and we had no occasion for any person circumstanced like the ancient pares, tenants of the same lord, to witness the livery of seisin. Besides, in a wilderness, how could witnesses remember the boundaries between *333 different tracts of land which were daily undergoing a change, in their progress from a wilderness to cultivated fields, (a) This mode of conveyance had been disused for more than a century in the country from which they emigrated ; it had been superseded by written conveyances. The first settlers were by no means illiterate ; they would not suffer by a comparison with their descendants in point of literature. They were capable of estimating the advantages of a general registry of conveyances. The deed of bargain and sale was in general use in England. Without some modifications, it could not well be introduced here. ' The colony was not divided into counties till 1648. Before that division we had no courts answering to those mentioned in the Statute of Enrolment. After the division we had none of the same names, and no such county officers as were contemplated by tlie statute.
It is probable that few transfers were necessary at the first settlement. The Government granted by vote. Neither livery and seisin, or enrolment, were necessary, viewing us as a sovereign power, which was pretty much the light in which we viewed ourselves. There was then no traffic in laud, and that valuable class of men called land-jobbers was entirely unknown. (b)
Regulations were early made to ascertain the extent of grants, and for recording actual surveys, in the several townships ; requiring individuals, as well as grantees of townships, to set out their bounds and record surveys, &c., 1634. But these regulations do not comprehend the recording of tilles, the evidence of grants, or conveyances.
By a law of 1639, it was ordered that there be records kept (books in which) to record all men’s houses and lands, being certified under the hands of the men of every town deputed for *334 the ordering of their affairs. It is not clear whether this was to be a recording by the secretary of the colony, or the clerk of the town. As no laws were made respecting deeds, or requiring their enrolment or recording, I conclude the first settlers, who were many of them from London and other cities or boroughs, concluded a deed was sufficient to pass lands without recording, because it was so in the place from which they came ; for land in any city, borough, or town corporate, was not within the Statute of Enrolment. I do not think that they understood, or intended to adopt, the Statute of Uses (and the Statute of Enrolment makes a part of it), for they do not appear to have complied with it; but they had this general impression, that lands might be conveyed by deed without livery and without enrolment, and go it might in London, &c. ; and it would be some time before they would experience any inconVenience from this usage, and it could hardly be expected that they should be more discerning than the people they left behind, in foreseeing the frauds, contentions, and suits which naturally flow from secret and clandestine conveyances. When time discovered them, they would naturally apply a remedy.
Accordingly, in 1640, an act respecting conveyances was made. The preamble shows the mischief: For avoiding all fraudulent conveyances, and that every man may know what estate or interest other men have in any houses or lands they are to deal in. By way of remedy, it was enacted that no ....[1] or grant or sale of any houses or lands, where the grantor remains in possession, shall be of any force against any person but the grantor and his heirs, unless acknowledged before some magistrate, and recorded by the clerk of the shire [?] court, not at length, but the names of grantor, grantee, date, and the thing and estate granted. This is the first act which required acknowledgment and recording. This act clearly implies that, as the law was then understood, a deed not acknowledged or recorded gave the grantee a good *335 title; (a) the deed, was good against all persons, though the grantor remained in possession. Some such case as this probably occurred, which occasioned the-statute. A., in possession, conveyed or mortgaged to B.; A, remained in possession ; afterwards C., supposing A. was owner, takes a conveyance absolute or in mortgage ; the judges held, or it was supposed would hold, that B.’s title was better than C.’s, though B.’s deed not recorded, and his grantor remained in possession even where the conveyance absolute. After this act, a deed unacknowledged and unrecorded was good against all persons, where the grantor did not remain in actual possession. The act gave the deed, acknowledged and recorded, of a grantor in possession a preference over deeds not acknowledged or recorded, the grantor being permitted to remain in possession j and all this was very reasonable. This is the first mention of acknowledgment as a requisite in a deed of conveyance in any case. In England, it seems to have been necessary before enrolment, though not mentioned in the Statute of Enrolment. It is implied in enrolment; for, generally, a deed could not be enrolled till acknowledgment.
In May, 1652, an important alteration in the law was made. Tlie preamble states tlie mischief, “ Clandestine and uncertain sales and titles.” The remedy, That henceforth no sale shall be good in law, except the same be done by deed in writing under band and seal, and delivered, and possession given upon part, in tbe name of tlie whole, by the seller, or bis attorney authorized under band and seal, unless tlie deed be acknowledged and recorded. This act superseded that of 1640. It requires all conveyances of land, of whatsoever estate ox interest, to be by deed, attended witb livery and seisin in deed or in fact, or acknowledgment and recording. The recording was only of the substance, and was not at length.
Tliis law repealed the English, if it had been before considered as binding, except so far as the two systems agreed. It was evidently the intention that this should be the wliole law on the subject. It adopts a part^of the law of feoffments, *336 and rejects the rest. In future, there must, in all cases, be a deed, and either acknowledgment and recording, or a certain livery, not any livery, and seisin. The acknowledgment and recording, or livery, were as necessaiy against the grantor as against others. This provision has the merit of being extremely simple, easy, and cheap, and, I think, complete of itself.
From this time, 1652 to 1697, the law respecting conveyances does not appear to have undergone any alteration. During all that time there was no occasion to have recourse to any English law.
In 1697, an act for registering deeds was passed in Massachusetts, in substance the same as their present law and ours, with the addition, in ours, of attestation. It is not stated in express terms that a deed with the formalities required by the acts of 1640 and 1652 shall be sufficient to pass land, as is stated in the act of 1697' and present laws. This was considered! as common law, and thus much may, perhaps, during all that time, have been borrowed from the Statute of Uses ; but this simple principle was all that was borrowed and retained.
It is observable that the act of 1697 is declaratory of the law, that deeds are sufficient to pass lands; it requires recording at length. If the statute had stopped at the declaratory clause, it might have been doubted — as the statute of 1652, made under the old charter, expired with that charter — what portion (if any) of the English common law or statute law was binding in the province. It was, therefore, added, that no bargain, sale, or other conveyance of lands shall be good and effectual iri law, to hold the same against any but the grantor and his heirs, unless the deed be acknowledged and recorded; a deed without acknowledgment and recording is effectual to ■ hold, lands against the grantor and his heirs. In the first clause, a deed which is sufficient to pass and hold lands in all cases is described; but, as the grantor and his heirs are not within the mischief of non-acknowledgment and non-recording, they are, therefore, excepted out of the general requirement. Such a deed as that described in the first clause shall *337 be sufficient to pass lands; no other shall be sufficient to hold the lands, except in the cases of grantors and tlieir heirs such deed, though not acknowledged or recorded, shall be sufficient. The conveyance is not, as it respects them, a clandestine or uncertain one. They want no information of a title which they or tlieir ancestor have parted with. They cannot be defrauded for want of notice.
' This act of 1697 has, therefore, made three important alterations in the law which prevailed under the old charter. 1st. It requires deeds to be recorded at length. 2d. It dispenses with acknowledgment and recording, where the deed is used against the grantor or his heirs. 8d. It repeals the common-law conveyance by livery and seisin, or by delivery of possession. Livery and seisin are now of no avail, unless it may be against grantor and his heirs; though I think it unnecessary as it respects them, for it would be accompanied with such a deed as the statute describes to pass the laud even from these, and such deed is sufficient without the livery and seisin.
What has been mentioned is the Massachusetts statute of 1697. Though New Hampshire was separated from Massachusetts in 1679, and, we are informed, made a code of laws for themselves soon after the separation, yet uo trace of it now remains. After the most diligent search I have not been able to find it.[1] It is very certain that our law, till 1679, was the same as the Massachusetts, and equally clear that the people of New Hampshire were, at that time, much attached to the Massachusetts government and laws. I have no doubt, and from what I see in the judicial records there can be no reason to doubt, that our statutes were copied from the Massachusetts. In 1701, our legislature enacted the Massachusetts act of 1697, and our present statute differs little from the act of 1701. The preamble to the Massachusetts act,, which is not copied in ours, is, Whereas it is necessary, to prevent fraud, uncertainty, and perjury, in the transferring of real estate, that a mode thereof should be established., easy, certain, and notorious.
*338 Our statute of 1791[1] contains a new provision, on which the question in the case at bar arises, that, in addition to the other requisites copied from the old statute, “ the deed must be signed by two or more witnesses ; ” that is, executed in the presence of two or more witnesses, who must sign their names as witnesses of the execution.[2]
Attestation was necessary, as we . are informed, by the canon law. No doubt-it was here borrowed immediately from the law respecting the attestation of wills. Blackstone and Cruise speak of attestation as a requisite, but add, it is necessary rather for preserving the evidence than for constituting the essence of the deed. In another place, Blackstone says, the actual subscription of the witnesses is not required by law, though it is prudent for -them to attest the execution. Wooddeson, Sheppard, and Perkins do not include attestation among the requisites of a deed at common law; they mention only writing, sealing, and, in most cases, signing and delivery. The law of New Plymouth implies that there must be at least two witnesses to a deed of conveyance. It would seem that the Connecticut statute requires witnessing. Barrington, in his Observations on the Statutes, says that the witnesses to a deed were anciently a necessary part of the jury which was to try the validity of the instrument. He thinks this occasioned *339 the necessity of attestation by two witnesses, which he considers as a troublesome and unnecessary ceremony. But if attestation were not necessary at common law, it was certainly usual both in England and here, and our statute has made it essential. And notwithstanding what is said by Barrington, I think it has its use. It serves to identify the instrument; it gives solemnity to tbe transaction ; hud it lias some tendency to protect the grantor from imposition, and from being suddenly entrapped. >
When a statute requires what might otherwise be considered as circumstance, — a mere ceremony,— it becomes essential, and must be observed. Attestation by two witnesses is made by the statute as necessary to a deed of conveyance, as attestation of three witnesses to a will of lands, and as necessary as a seal to a deed at common law. Tbe instrument cannot be received in evidence in either case without. The instrument without attestation is not a deed of conveyance. It differs from acknowledgment and recording ; tbe instrument may be a deed of conveyance without these, and the land passes without these, though these are necessary to its operation as a conveyance in certain cases. But tbe land does not pass without a seal, nor without attestation, delivery of the deed, &c. (a)
I conceive it to be clear that all deeds of conveyance must be so attested. The deeds of conveyance spoken of in both clauses of this section are the same; must have the same requisites, i. e. they must be deeds of conveyance. It would be absurd to suppose that, though tbe first clause describes what shall be the requisites of a deed of conveyance, the second clause, speaking of a deed of. conveyance, means a different instrument, a common-law deed, an instrument with other and different requisites. The , only use of the second clause was to lake away, or repeal, the common-law ceremony of livery and seisin, and to dispense with acknowledgment *340 and recording in the case of the grantor and his heirs. There is no reason why attestation should not be equally necessary to pass the lands as to hold them ; as necessary where acknowledgment and recording may be dispensed with, as where they must be observed; equally necessaiy where the deed is to affect the grantor and his heirs, as where it operates on others. Indeed, the reason is stronger for attestation where acknowledgment is not required than where it is necessary. In such case, a person might lose his land merely on proof of similarity of handwriting. It is of the nature of all requisites in any instrument that injustice should sometimes be done thereby. This is the nature of laws themselves. Summum jus is sometimes summa injuria.
Some observations have been made on the negative clause of the statute in question, with an intention to show that, in the latter clause, the word “ deed ” has the same signification as in the former; that it means, in the latter, the statute (|eed of conveyance, the requisites of which had been just enumerated; no such deed shall be sufficient to hold such lands against any but the grantor and his heirs, unless acknowledged and recorded ; against them, such deed shall be sufficient to hold the lands. If the word “deed,” or “ conveyance, — and they signify the same thing in this whole section, — means a deed at common .law, not attested, then the first clause declares that a deed attested, &c., acknowledged and recorded, shall be valid to pass lands; and the second, that a deed not attested, but acknowledged and recorded, shall be sufficient to hold the same lands, which is absurd; and equally absurd to suppose that the same word is used in one [?] sense, when applied to different persons, when there is nothing in the case which requires any such violence to the rules of interpretation. There is no difficulty in arriving at the true sense of these two clauses, supposing the word “ deed ” to be used in the same sense in the latter as the former, i. e. a writing, signed, sealed, and attested. It was well understood a century ago, as it is now, that the acknowledgment and recording make no part of the deed, but the attestation does. It is no more a deed, till attested by two witnesses, than an instrument, purporting to be a will, is a *341 will, till it is attested by three. When a statute requires that an instrument shall bo executed in the presence of witnesses, it does not become such instrument merely on the signature of the signer; there must be the attestation of the witnesses. 1 Crunch, 239-251. When attested, the execution is complete, and not before ; and our deed of conveyance takes effect from the making ; the land then passes. The acknowledgment is a mere warrant for the recording and aids in the proof or authentication of the transaction ; and the recording is principally for the purpose of giving notice. Where the grantee neglects to record his deed, it shall not, in certain cases, and under certain circumstances, be effectual to hold the lands which had passed by it. One use of the second clause was to lay down a rule by which it may be known when recording is essentially necessary to enable a grantee to hold lands. As it respects the grantor and his heirs, the statute rule is that recording is not necessary. Recording is useless to them. They cannot suffer for want of notice. But, where others do suffer, or may be supposed to suffer, for want of recording, there the statute rule is that recording is essential to enable grantee, not to take, but to hold against such. The deed, act, or instrument, necessary to pass lands, must be the same, as it respects all persons. On the execution of the deed as the statute requires, the land passes, and there is the same, if not greater, reason why it should not [?] be signed, sealed, and executed in the presence of witnesses in the one case as well as the other; the statute has made no such difference. But the circumstances or requisites to be observed, to enable grantee to hold the land against grantor and his heirs, and against other persons, may be different, and call for different provisions and regulations. These other persons may suffer for want of notice that the land has passed from grantor. To guard them against any injury from this ignorance, the law declares that the grantee, who was bound to give the requisite notice by recording his deed, shall not hold the land. There is no such thing as a common-law deed. To pass lands, the deed must be such a one as the statute requires; it must have all the requisites necessary to constitute it a deed of conveyance ; and it must, *342 moreover, be followed by acknowledgment and recording in certain cases.
An opinion has been expressed, in the course of the observations which have been made, that the first settlers of New England did not intend'to adopt the Statute of Uses, except so far as regards the principle that lands might be passed by deed.
Of necessity, the English modes of conveyance must be many and complicated. The alterations of .property must necessarily introduce new modes of conveyance, and it would be natural to suppose (if we did not know the fact to be so) that the legislature would both frame new modes of conveyance, and add new circumstances to those which custom and use had gradually introduced. It is, indeed, well known that much of the law of conveyancing now in force in England was originally the offspring of fraud and evasion. The doctrine of uses sprung from a desire to evade the restraints imposed on alienation, and especially to religious corporations'; to elude the common-law mode of conveyance, which was open and notorious; and to escape from the feudal burdens. The number of English conveyances is, therefore, easily accounted for, and that there should be different forms adapted to different cases. They grew out of the exigencies of the occasion. Their uncertainty and confusion has a double source, — ignorance and ingenuity; ignorance of the law in some, and ingenuity to evade it in others. At the first settlement of this country, a deed, as a mode of conveyance, was in general use in England. It would be believing against evidence to suppose that the first settlers of Massachusetts were well skilled, or even tolerable proficients, in that branch of English law called conveyancing. Blackstone speaks of the intricate nicety of uses, as still prevailing in English conveyances, and of the ingenuity of an able artist as necessary to mould the doctrine of uses to useful purposes. The occasion for many English forms did not exist here at all. How to apply such as might be applicable was a branch of knowledge, I may say, wanting in all. Let any one, for a moment, *343 advert to the several modes by which a title to real estate might be transferred from one man to another, according to the different interests or estates of the seller, and those intended to be vested in the purchaser, and he will at once feel the force of this observation. It would consume too much time even to draw the outline of English conveyances. Blackstone enumerates thirteen species, and each of these was applicable to a variety of causes. It would require a volume to enumerate the cases to which each of these modes might be applied. A feoffment was, perhaps, the most simple ; but what was a good livery and seisin was oftentimes a question of no small difficulty, and a mistake here was fatal. Terms of years, however long, say one thousand, might be created and transferred by deed, without witnesses, acknowledgment, or recording, and without any entry on the land or delivery of possession. Estates of inheritance in many cases, and any less estates, might be passed in the same manner. Some deeds required a pecuniary consideration to render the conveyance valid; in others, no consideration was necessary; while in a third class the consideration must be —■ I do not say may be, but must be —■ blood or marriage. The local situation of the land, and the quantity, or estate of the seller or intended purchaser, wefe material circumstances in judging of the proper form of conveyance, and, in case of bargain and sale (which must be by indenture), whether necessary to be enrolled or not. The presence of witnesses at a transfer of so much importance was in no case required. The acknowledgment seems to have depended, for its authority, merely on regulations made by the several courts. Recording or enrolment (though property of every kind might be transferred without it), when it took place, might be in any of five different places, at the election of the party. Before 1677, most things [?] might be created' and transferred by parol. Some conveyances were at common law. Others derived their force and effect, — some altogether and others in part,— from the Statute of Uses. Some were original. Others presupposed a former conveyance. Some were calculated to transfer the land, the actual possession; and were available *344 only where the seller was in the actual occupation. Others could convey only a right or imperfect title. Some could convey no more than the seller could lawfully transfer. Others could transfer that which he had no lawful right to convey. In the conveyances under the Statute of Uses, the whole intricate, nice, and ingenious doctrine of uses was necessary to be known.
This slight sketch is enough to make us thankful that the first settlers of this country had the prudence to reject the whole en masse. What part should they have adopted, what part did they adopt, of these many and ever-varying forms ? If they had concluded to adopt the English law of conveyancing, it would have been necessary immediately to have imported a body of convej'ancers. Instead of this course, they contented themselves with one simple form, and got along as well as they could without any professional man at all.
Let the English forms be contrasted with one every way suitable to our wants, the state of our country, and the degree of law-knowledge possessed by those who must necessarily make conveyances here. There are few owners of real property who may not be presumed to know the property or estate they possess, and what they intend to convey. In England, the difficulty begins at the next step. Who can tell what form of conveyance will best effectuate the intention of the parties ? When the best form is chosen, it requires no small skill to observe the necessary precision. Now all these difficulties arise, not from any intrinsic difficulty in the subject, but from the multitude and variety of forms, which honesty and knowledge, fraud and ingenuity, have contrived in the science of alienation. The course adopted in the earliest times here, how different! The instrument of conveyance must be a deed, i. e. a writing sealed and delivered ; and, to give it more solemnity, and to protect the grantor from imposition, it must now be attested by two witnesses at least, (a) Land passes as well without as with *345 consideration. The form of the instrument is no way material. Technical words are not, in general, necessary. Our conveyances may be in the simple form used in ancient feoffments ; the execution of the deed and the recording are in the place of livery and seisin. The transaction is solemn and certain ; there must be writing, sealing, delivery, attestation, acknowledgment before a magistrate; for the. benefit of the public, the transaction must be notorious, and the records at once preserve the evidence and give publicity. All estates of every name and nature, corporeal • and incorporeal, pass by deed, (a) It is immaterial whether the estate be in possession, remainder, or reversion, holden with others or in severalty. A quitclaim passes the land or the right, as the case may be. I cannot but think that this was intended as a substitute for all the English modes and forms ; and that it operates by force of our statute. It is true, a deed may be so framed, if the parties so please, as to refer, in construction, to the . Statute of Uses. But I forbear to enlarge.
If the historical view which I have endeavored to give of our law of conveyance and the exposition of the statute be at all correct, I think we are furnished with an easy answer to the question, whether the deed from Bennet to Thompson was admissible in evidence ; and it will, on these principles, be easy to answer all the objections which have been urged in favor of the admission. Though I have gone over a good deal of ground, I have aimed at a direct course, and have not suffered myself to be diverted from it to discuss a vast number of questions which have lain in my way. The principles of English law to which I have alluded are, 1 believe, all abundantly clear. As to what relates to our statutes, usages, &c., unfortunately we have no authorities to appeal to..
To support this action, plaintiff must show title ; i. e., that the land passed to and became vested in him. It is not sufficient to show a contract by which the true owner became *346 entitled to a conveyance; he must show a conveyance, (a) Not sufficient that he may have an equitable title; he must have a legal one. If he has advanced money in expectation of a conveyance, and none made, he has his action of money had and received, or on the contract; (b) if in expectation of m. [mortgage ?], the m. debt is still undischarged. Pie pretends to no title except what the deed gives. He has offered no evidence, made no case, except what the deed makes for him. He had no prior possession, and admits defendant in possession, where he may remain till plaintiff shows title. If plaintiff has no legal title, defendant is safe. There may be cases where imperfect title — mere possession — would be good against a defendant; but no such ease is made here. Plaintiff shows this deed, for all and every thing, as a conveyance. If plaintiff had possession, and defendant sued him on the ground that the deed was invalid, especially if all fair, and possession delivered or taken under it, Thompson might have good defence. 5 Binn. 129. But the question now is, Did the land demanded pass by this deed ? The answer is, This is not a deed of conveyance under our statute, because not executed as the statute requires; all statute deeds of conveyance must be attested by two witnesses at least.
But it is said the statute only mentions affirmatively that certain deeds are deeds of conveyance, but there are no negative words. This has been already noticed. No conveyance is good unless the deed be acknowledged and recorded, except in the case of grantors. “ The deed ” means such a deed as is mentioned in the first clause, and there must be such deed to pass the land at all. It would be absurd to say that this deed passed the land in this case and did not pass it in every other case. The same land cannot pass and not pass by the same deed. . It may pass, and yet not be holden. Now suppose, after this judgment in favor of Thompson, that the land passed by this deed, he should be obliged to maintain an *347 action against a disseisor of Bennet, or one claiming by extent as Bennet’s creditor; could it then be holden that the land did not pass ?
The attestation is just as necessary as if Thompson claimed by will; or as necessary as a seal. :;-(5 Mass. 459,460.)
It is said, if this is to be considered as a statute deed, it is only defective, and chancery would relieve ; and if chancery would compel a new and perfect execution, this court may consider it as done. Answer: Chancery could not relieve in this case. When a statute requires certain things to be done, courts of equity are bound as much as courts of law. 2 Fonbl. 49, n. c ; 3 Bro. Ch. C. 571. Courts of equity sometimes presume livery and seisin from possession. Here, Thompson has had no possession.
It has been further contended that this, though not a deed of conveyance within the statute, estops defendant from claiming the land.
Answer : The doctrine of estoppel does not apply. 2 Blaekst. 295. This is a deed-poll, and therefore no estoppel. 2 Har. & M. 193. Here is no estoppel by the covenants ;[1] for, if the land did not pass and could not pass, though seller had title, the covenants are inoperative ; no deed, no covenants. Shep. 223. Bennet is not estopped from saying that this is not a deed of conveyance ; and' that is all that is necessary for him to say in answer to this action. Suppose it had no seal. In this case he may admit it is his deed, and deny that it passed the land.
But it is contended that this instrument is a deed at common law. The party must go farther, and maintain that it passed the land. It is to be observed that the common law does not *348 distinguish between the grantor and others ; a deed that passes the land as to one passes it as to all persons.
What common law. is intended ?
If the English, I know of none such. It is not a feoffment, for no livery. It is not a lease nor a release, because Bennet was in possession, &c.
If our common law be' intended, show us the evidence of this. I find none. It is said we adopted the English Statute of Uses. Where is the evidence of it? If we did, it was a most imprudent act, and certainly a leap in the dark. We did not adopt it; and, if we did, it was repealed by statutes 1652 and 1701, and present statute. But, if we adopted the. Statute of Uses, we must have taken the Statute of Enrolments, which passed at the same session, and is always to be taken as part of the Statute of Uses, — and a most necessary part, a sine quá non. But, if we adopted the Statute of Uses without the Statute of Enrolment, (a) this is not within it. It is essential that it should be an indenture. This is a 'deed-poll. 2 Blackst. 338; Shep. 222; 3 Blackst. 336; Paca v. Forwood, 2 Har. & M. 175. It is not enrolled as the statute requires. The doctrine seems to be that we adopted just so much of the English law as is necessary to make out this case. The truth is, we just borrowed the principle that land might pass by deed, and reserved to ourselves the right of adding requisites to the deed, and circumstances of solemnity and notoriety, acknowledgment, and recording, all in our own way.
It has been said this is a covenant to stand seised. It is not; for there it is essential that the consideration should be blood or marriage, and this is neither. 2 Blackst. 337 ; Sullivan, 89; 2 Har. & M. 198.
In .short, admitting ‘this deed as a valid conveyance would repeal our laws for at least one hundred and sixty years past.
When the cause was first opened 1 hoped to be able to find principles upon which the deed could be supported. I have spared no pains to find such principles, but have met *349 with no success. I am now convinced that there are no such principles.
The verdict must be set aside, and a general verdict entered for defendant.[1] .

 Feoffment had long before lost most of its solemnity and notoriety. Rob. 262-272.

 This mode, in such a country as ours, and especially at that day, was neither easy, certain, nor notorious; not calculated to prevent, hut to encourage, frauds and perjuries. It wants the sanction and certainty of a record to preserve the memory of the transaction.

 Grants wore usually made of large tracts to different companies of adventurers. These assigned small portions to each individual; the residue they held in common.

 Abbreviations are used here in the manuscript, probably signifying different forms of conveyance named in the statute.

 And so the law continued to be, as far as the grantor and his heirs are concerned.

 The jST. II. Code of 1679-1680 is now printed in 1 Provincial Papers, 882-408; and also in Yol. 8, N. H. Ilist. Soc. Pub.

 The statute of Feb. 10, 1791, enacts, That all deeds or other conveyances of any lands, tenements, or hereditaments, lying in this State, signed and sealed by the party granting the same, having good and lawful authority thereunto, and signed by two or more -witnesses, and acknowledged by such grantor or grantors before a justice of the peace, and recorded at length in the registry of deeds in the county where such lands, tenements, or hereditaments lie, shall be valid to pass the same, without any other act or ceremony in'law whatever; and no deed of bargain and sale, mortgage, or other conveyance, in fee-sinrple, fee-tail, or for term of life, or any lease for more than seven years from the making thereof, of any lands, tenements, or hereditaments in this State, shall be good and effectual, in law, to hold such lands, tenements, or hereditaments against any other person or persons, but the grantor or grantors, and their heirs only, unless the deed or deeds thereof be acknowledged and recorded in manner aforesaid.

 In Forsaith v. Clark, 1850, 21 N. H. 409, it was held, that the provincial laws in force in 1738 did not require a deed to be witnessed.

 In our former statutes it seems implied that a deed of conveyance must be witnessed. Stat. 1701 speaks of proof which is to supply the place of acknowledgment by the oaths of two of the witnesses thereto subscribed.

 This cannot be considered as imposing any hardship, for it was always the usage.

 And all deeds must be executed the same way, and attended with the same solemnities.

 Sed vide 2 Binn. 129, Campbell v. Spencer (this was an act of assembly).

 6 Manuscript Reports, Bothel v. Bundy, 15, 21; 6 T. R. 606; 1 Dall. 428.

 Sustained by Woods, J-, in Rundlett v. Hodgman, 3844, 16 N. H. 239, 240; Lessee of Patterson v. Pease, 1831, 5 Ohio (Hammond) 190; Wallace’s Lessee v. Miner, 1834, 6 Ohio (Hammond), 866; Doe d. Stevens v. Bays, 1848, 1 Ind. (Carter) 247; Connor v. McMurray, 1861, 2 Allen, 202; Doyle v. Coburn, 1863, 6 Allen, 71 (but see Foss v. Strachn, 1860, 42 N. H. 40).
See also Doe d. Chandler v. Ford, 1835, 3 Ad. & E. 649; Atkinson v. Bell, 1857, 18 Tex. 474, 479; Dougal v. Fryer, 1831, 3 Mo. 29.

 As has been holden in some States. Qu. N. T.

 This decision was overruled in French v. French, 1825, 3 N. H. 234, where it was held that a deed with only one witness, though not good under the statute of 1791, might yet operate' as a conveyance under the Statute of Uses, and so pass the estate. As the decision in French v. French has now been acquiesced in for more than half a century, and as there are titles dependent upon it, it will, of course, be adhered to, notwithstanding any doubt of its intrinsic correctness.
The statute was changed in 1829, so that a deed without two witnesses would not pass the land, even between the^párties. Stone v. Ashley, 1842, 13 N. H. 38; Rundlett v. Hodgman, 1844, 16 N. H. 239.
By the Revised Statutes of 1842, “the law of 1791 was substantially restored;” and accordingly a deed with only one witness, executed since the Revised Statutes, is held good as against the grantor and those having notice. Hastings v. Cutler, 1852, 24 N. H. 481; Sanborn v. Robinson, 1873, 54 N H. 239.
In Barker v. Bean, 1852, 25 N. H. 412, it was held that an assignment of real estate for the benefit of creditors, executed in 1850, attested by only one witness, was invalid as against an attaching creditor with notice. Portions of the opinion are somewhat misleading; but the decision is sustainable upon the ground that the assignment'must be so executed as to be effectual against all the creditors. If its validity as to each creditor could be allowed to depend upon the question whether such creditor had received actual notice, it might be good as to part of the creditors, and invalid as against the rest; thus permitting the inequality of distribution which the assignment statute was intended to prevent.
Among the cases which recognize the Statute of Uses as being in force in this State are Tappan’s Appeal, 1875, 55 N. H. 317; Hutchins v. Heywood, 1871, 50 N. H. 491; Upham v. Varney, 1844, 15 N. H. 462.